**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

**MDG-RIO V LIMITED,**

     *Plaintiff,*

**v.**                                                    **Case No. SA-18-CV-0882-JKP**

**CITY OF SEGUIN, TEXAS,**

     *Defendant.*

## MEMORANDUM OPINION AND ORDER

This case involves the purchase of land ("the Property") by Plaintiff, a subsequent annexation by the City of Seguin, Texas, ("Defendant," "the City," or ""Seguin") that included the purchased land, and a zoning ordinance prohibiting use of the land in a manner Plaintiff wants. Before the Court is *Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's Regulatory Takings Claim and Request for Declaratory Judgment* (ECF No. 68). The motion is fully briefed, including evidence submitted by both sides.[1] After considering the motion, related briefing, relevant evidence, and the applicable law the Court denies the motion.

## I. BACKGROUND[2]

Plaintiff MDG-Rio V Limited ("Plaintiff" or "MDG") and non-party Texas Realty Retail Partners, LLC ("TRR") are part of a real estate development group operated by Robert McDonald III ("McDonald") and his son Robert McDonald IV ("R.W. McDonald"). No one disputes what property is at issue in this case or that it relates to a proposed Rio Verde Subdivision. And, although

---

[1] Plaintiff has filed eighteen exhibits (ECF Nos. 68-1 through 68-18, hereinafter referred to as Exs. 1 through 18) with its motion. The City has supported its response with three exhibits (ECF Nos. 69-1 through 69-3, hereinafter referred to as Exs. A, B, and C).

[2] The facts are viewed in the light most favorable to the City in accordance with the summary judgment standard.

Plaintiff is a specific entity within the McDonald real estate development group, there is no apparent reason to distinguish between MDG, on one hand, and TRR, on the other. The Court, therefore, may at times reference Plaintiff when the more accurate reference would be McDonald or TRR.

On February 20, 2017, TRR entered into two Farm and Ranch Contracts to purchase the Property from its previous owner, Joe McCart ("McCart"). *See Ex. 2.* In Section 8 ("Purchaser's Zoning and Platting Contingency") of Exhibit B to each contract, the parties expressly made "all of the Purchaser's obligations . . . contingent on obtaining approval of the re-zoning and platting of the Property allowing the Property to be developed and subdivided as a manufactured home subdivision." *Id*. § 8. Each Section 8 also provides that (a) "Purchaser will pay for applications, legal representation and any other costs associated with the application and approval process" and (b) "If the City requires the application to be signed by the current owner, Seller agrees to do so." *See id*. Each Section 8(c) also provides three options to the Purchaser should "a final, non-appealable approval" not be obtained prior to closing, including (i) extending the time for closing, (ii) accepting "the Property with the current zoning and agree[ing to] waive this contingency" or (iii) terminating the contract. *See id.* Further, each Section 8(e) ("No Final Action Prior to Closing") states: "Purchaser acknowledges that Seller does not desire and will not approve of a zoning change or plat filing occurring prior to Closing. It is agreed that any final approval of a zoning change or plat filing must occur post-closing *or concurrent with closing*." *See id.* (italics added). The italicized language is a handwritten addition to each Section 8(e).

By letter dated August 29, 2017, an agent for TRR, Hermann Vigil ("Vigil"), informed the City that its "Letter of Application" concerned a proposed development consisting of "120 lots in a single family residential subdivision." *Ex. C.* The next day, that same agent transmitted a preliminary plat application ("Application") to the City, which received it on August 31, 2017. *See*

2

*Ex. 3*. The application includes a Letter of Authorization, signed by McDonald for TRR and granting Vigil authority to act  as agent for TRR. *See id*.

Although ownership of the Property had not yet been passed to TRR, the application listed TRR as the "Record Owner of Property/Agent." *See id*. At the time of the application, the Property was located in the City's Extra Territorial Jurisdiction ("ETJ"). [3] *Ex. 4*. On October 10, 2017, the City's Planning and Zoning Commission approved the application with "staff recommendations." *See id.*

Pamela Centeno, the City's Director of Planning & Codes, emailed McDonald on October 31, 2017, to inform him that the City Council intended "to consider proceeding with annexation of that property." *Ex. 12* (hereinafter *Centeno Dep.*) at 129. More specifically, Centeno informed McDonald that "[t]he proposed area for annexation includes the two parcels within the proposed Rio Verde Subdivision." *Centeno Dep.* Ex. 10. She wanted to alert him of the "decision to take the first step towards annexation," because he had attended predevelopment meetings and had a preliminary plat. *Id.* at 133. In response that same day, McDonald stated the following assumption and question: "My assumption would be that our development rights and entitlements are grandfathered under State law, that we would not be subject to any changes in requirements. Is the City of Seguin taking a different position?" *Id.* at 131 & Ex. 10.

At 6:25 a.m. on November 1, 2017, Centeno responded to McDonald's inquiry. *Id.* at 131-32 & Ex. 10. She responded: "Yes, the development rights and entitlements that you are subject to under State law (Chapter 245) will be honored." *Id.* at 134 & Ex. 10. At her deposition, she further noted that her response "very vaguely" stated that his rights and entitlements were "[s]ubject to

---

[3] When property is located in a City's ETJ, the City can enforce rules and ordinances governing plats and subdivisions of land, but it is not authorized to enforce building code and building permit requirements. *See, e.g.*, *Town of Lakewood Vill. v. Bizios*, 493 S.W.3d 527, 531 (Tex. 2016); *Collin Cty. v. City of McKinney*, 553 S.W.3d 79, 85 (Tex. App. – Dallas 2018, no pet.).

what he's entitled to under state law." *Id*. at 136. When she responded to the inquiry, she did not know he was not the owner of the Property. *See id*. at 132, 134.

But later that day after she discovered that McDonald was not the owner of the Property, she sent a follow-up email. *See id*. 136. In this later email, she stated: "In looking back at the Preliminary Plat application and letter of submittal, I show that [TRR] is the owner of the properties included in the proposed plat. The letter states that you are the Managing Partner. Who is the property owner of record that you are referencing?" *Id*. Ex. 10. At this point, Centeno had determined that McDonald "was not the property owner." *Id*. at 136.

Centeno agreed that, "as of November 1, 2017, the preliminary plat application ha[d] been approved by the City of Seguin ," but also clarified that the approval was "[w]ith conditions." *Id*. at 135. On November 6, 2017, Plaintiff objected to the proposed annexation. *See id.* Ex. 11. The City commenced annexation proceedings related to the Property on November 7, 2017. *See Ex. 9.* A week later, R.W. McDonald asked for a meeting "to get more information on the potential annexation as well as discuss some miscellaneous questions regarding our Rio Verde subdivision." *Centeno Dep.* Ex. 11. The next day, Centeno responded: "If you have specific questions about Chapter 245 vesting and how they apply to this subdivision, they will need to be in writing so that I can consult with the City Attorney. . . . Can you give me a better idea about the questions you have?" *See id*. Centeno did not recall receiving a response to that question. *See id*. at 142.

According to Plaintiff, on November 22, 2017, McDonald and the Mayor of Seguin spoke about a plan to develop the Property as a manufactured home subdivision and the Mayor asked that the subdivision be developed as a "traditional 'stick built' single-family subdivision." *See Ex. 15* ¶ 3. And in an email dated December 4, 2017, McDonald informed Centeno of Plaintiff's intent to market manufactured housing while also recognizing "that the City Council has authorized

initiation of the Annexation process." *Centeno Dep.* Ex. 12. At this point, Centeno "for sure" knew McDonald "was planning a manufactured home subdivision for the property." *See id*. at 145.

"MDG, as TRR's assign, closed on the Property on December 20, 2017, for $1,136,962." *Ex. 15* ¶ 5. Plaintiff acquired the Property on December 22, 2017. *See Letter from Jeffrey Howard to Andrew Quittner, City Attorney (Apr. 17, 2018) (on file in Ex. 10) (hereinafter Letter from Howard to Quittner (Apr. 17, 2018)).*

On February 12, 2018, the City acknowledged that it sent notice of annexation to the former owner of the Property. *See id*. Through Ordinance No. 2018-012, the City passed, approved, and adopted the annexing of a tract of land on March 20, 2018, after providing two opportunities for the public to be heard in February 2018 and passing that ordinance on its "first reading" on March 6, 2018. *See Ex. 5*. The annexation would be effective commencing April 1, 2018. *See id*. No one disputes that this annexation included the Property at issue in this case. After Plaintiff submitted a final plat and construction plan application, the City expressed an issue with the plat on March 23, 2018. *See Letter from Howard to Quittner (Apr. 17, 2018).* According to Plaintiff's expert, the Property would be valued at $1,780,000, as of March 30, 2018, assuming that it had received a preliminary subdivision plat approval that entitled it to final subdivision plat approval for development of a single-family residential subdivision in the Seguin ETJ. *See Ex. 17 (hereinafter "Expert Report")* at 1-2.

On April 10, 2018, counsel for Plaintiff sent the first of three letters to the City. *See Letter from Jeffrey Howard to Pamela Centeno, Dir. Planning & Codes (Apr. 10, 2018) (on file in Ex. 10).* Plaintiff therein expressly objected to zoning its property in a manner that would be inconsistent with its planned use as a manufactured housing residential development. *See id*. It explained that "a completed application for a preliminary plat was filed, accepted, and reviewed and

approved by the City as the Rio Verde Subdivision while the Property was in the ETJ and not subject to the City's zoning regulations." *Id*. It informed the City that Tex. Loc. Gov't Code § 43.002(a)(2) prohibited the changed zoning. *Id*.

The next day, Centeno sent a Memorandum to other City officials addressing a request to designate the newly annexed area as "Single Family Residential (R-1)" for zoning. *See Ex. 9*. Within that Memorandum, she informed other City officials that (1) ownership of affected "properties changed during the annexation process when the developer purchased the properties"; (2) the new owner opposed the proposed change on April 10, 2018; (3) the new owner had expressed interest in developing a subdivision that allows for manufactured housing, which is not allowed under the requested zoning designation; (4) the City had received an application for a preliminary plat in August 2017 and "[p]er the applicant's letter, the proposed development was to be a single family residential subdivision with 120 lots"; (5) the developer, and not the property owner, had signed the legal authorization: (6) the submitted preliminary plat is void because of the lack of "legal authorization from the true property owner of record"; and (7) no completed application exists prior to commencement of the annexation proceedings on November 7, 2017, and even if a valid application existed, the City was not made aware of the developers' intention to market the subdivision as manufactured housing until after those proceedings commenced. *Id*.

With respect to the letter to Centeno, Andrew Quittner of the City Attorney's Office drafted a response the evening of April 10, 2018. *See Letter from Andrew Quittner, City Attorney, to Jeffrey Howard (Apr. 10, 2018) (on file as Ex. 11); Ex. 13* (hereinafter *Quittner Dep.*) at 137.  In that response, he explained that the legal recitation by Howard does not apply because (1) no one reserved anything with respect to a manufactured housing development prior to the initiation of annexation; (2) "the only writing prior to that date" stated that "the proposed development" would

be for "120 lots in a single family residential subdivision"; (3) the City did not obtain "specifics of the development . . . until after the City Council had taken its initial action on the annexation"; (4) "no approved preliminary plat exists" because the filing was "void *ab initio*, as a matter of law"; (5) the preliminary plat application failed to meet the City's requirements; (6) the approval "was 'conditional' and the conditions were never met; and (7) the approval was given before the City learned of the signature issue with the plat application. *See Letter from Andrew Quittner, City Attorney, to Jeffrey Howard (Apr. 10, 2018) (on file as Ex. 11).*

On April 17, 2018, counsel for Plaintiff responded to the City's response by addressing the intended land use, the validity of the preliminary plan, and an opportunity to cure the defect. *See Letter from Howard to Quittner (Apr. 17, 2018).* On April 30, 2018, Plaintiff requested that the City postpone the rezoning until after a meeting between it and the City. *See Letter from Jeffrey Howard to Don Keil, Mayor (Apr. 30, 2018) (on file in Ex. 10).*

On May 1, 2018, the City zoned the Property as "Single Family Residential (R-1)" through Ordinance No. 2018-021 (the "Zoning Ordinance"), which had been passed and approved on both April 17 and May 1, 2018. *See Ex. 6.* Such a zoning designation prohibits development of the Property as a manufactured home subdivision. *See Ex. 9*; *Centeno Dep.* at 256; *Ex. 13* at 131. Plaintiff identifies that use as its planned use ("Planned Use"). According to Plaintiff's expert, that zoning reduced the value of the property by $400,000, as of May 2, 2018. *See Expert Report* at 1-2.

On August 27, 2018, Plaintiff commenced this civil action. *See Orig. Compl.* (ECF No. 1). Plaintiff's expert completed an appraisal report on July 31, 2019, in which it retrospectively appraised the value of the Property as noted previously and appraised the then current value of the Property as $2,030,000, as of July 23, 2019, assuming a grandfathered manufactured home use.

*See Expert Report* at 1-4.

As of July 26, 2019, Plaintiff's *First Amended Complaint* (ECF No. 54) became its opera-

tive pleading. It asserts four claims under 42 U.S.C. § 1983: (1) an unconstitutional regulatory

taking, substantive and procedural due process, and equal protection. *First Am. Compl.* ¶¶ 39-46.

It also brings claims under principles of estoppel and under 42 U.S.C. § 1982 and the Fair Housing

Act, 42 U.S.C. § 3601, et seq. *Id.* ¶¶ 47-52. It seeks monetary damages in addition to declaratory

and injunctive relief. *See id.* ¶¶ 53-58. With respect to its first requested declaratory relief, it

> seeks a declaratory judgment that a right to develop the Property as a manufactured
> home subdivision became vested under Texas law due to the application of § 43.002
> of the Texas Local Government Code on August 30, 2017 when the preliminary
> plat application was filed or, at the latest, October 10, 2017 when the plat applica-
> tion was approved by Seguin.

*Id.* ¶ 55. It also seeks two declarations not at issue in the motion pending before the Court.

Plaintiff thereafter moved for partial summary judgment. Through that motion, it seeks (1)

summary judgment as to its claim under 42 U.S.C. § 1983 that the City is liable for a regulatory

taking in violation of the Fifth Amendment to the United States Constitution and (2) a declaratory

judgment that it has a protected legal right under Texas law to develop the Property as a manufac-

tured home subdivision. It contends that the Zoning Ordinance effectuated a "regulatory taking"

in violation of the Fifth Amendment to the United States Constitution and precludes it from devel-

oping the Property as a manufactured home subdivision in violation of its protected land use rights.

Although Plaintiff seeks summary judgment on the regulatory takings claim, it does not seek sum-

mary judgment with respect to damages on that claim, which would remain a question for the trier

of fact regardless of the summary judgment ruling.

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "As to materiality, the substantive law will identify which facts are material" and facts are "material" only if they "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over material facts qualify as "genuine" within the meaning of Rule 56 when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Given the required existence of a genuine dispute of material fact, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48. A claim lacks a genuine dispute for trial when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When "the movant bears the burden of proof on an issue," the movant "must establish beyond peradventure all of the essential elements of the claim" to warrant judgment as a matter of law. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). And, when considering a motion for summary judgment, courts view all facts and reasonable inferences drawn from the record "in the light most favorable to the party opposing the motion." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016) (citation omitted).

Once the movant has carried its summary judgment burden, the burden shifts to the non-movant to establish a genuine dispute of material fact. With this shifting burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Unsubstantiated assertions, improbable inferences, and un-supported speculation are not sufficient to defeat a motion for summary judgment." *Heinsohn*, 832

F.3d at 234 (citation omitted). Additionally, the courts have "no duty to search the record for material fact issues." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010); *accord Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012).

### III. DECLARATORY JUDGMENT

Plaintiff moves for summary judgment on its request for declaratory judgment that it has a protected right to develop the property at issue as a manufactured home subdivision. It contends that its right "vested under Texas law" either on August 31, 2017, when the preliminary plat application was filed, or no later than October 10, 2017, when the City approved the plat application. *Mot.* at 13. It premises this portion of its motion on Tex. Loc. Gov't Code § 43.002(a)(2), which provides:

> A municipality may not, after annexing an area, prohibit a person from: . . . (2) beginning to use land in the area in the manner that was planned for the land before the 90th day before the effective date of the annexation if . . . (B) a completed application for the initial authorization was filed with the governmental entity before the date the annexation proceedings were instituted.

Although not briefed by either party, the Court first considers whether Plaintiff's request for declaratory judgment is proper for summary judgment. In pertinent part, the Declaratory Judgment Act, 28 U.S.C. § 2201, provides:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

"The Act 'creates a remedy, not a cause of action.'" *Medrano v. Salazar*, No. 5:19-CV-0549-JKP, 2020 WL 589537, at *3 (W.D. Tex. Feb. 5, 2020) (quoting *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007)). The Act is "an authorization, not a command." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam); *accord Soc'y of Separationists,*

*Inc. v. Herman*, 959 F.2d 1283, 1287 (5th Cir. 1992) (en banc). It authorizes the federal courts "to make a declaration of rights" but does "not impose a duty to do so." *Pub. Affairs*, 369 U.S. at 112.

"When considering a declaratory judgment action, a district court must engage in a three-step inquiry." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000). "A federal district court must determine: (1) whether the declaratory action is justiciable; (2) whether the court has the authority to grant declaratory relief; and (3) whether to exercise its discretion to decide or dismiss the action." *Sherwin-Williams Co. v. Holmes Cty.*, 343 F.3d 383, 387 (5th Cir. 2003).

Plaintiff here has "presented a justiciable claim" because there is "an actual controversy among the parties." *See id.* Furthermore, based on the various federal claims raised in this action and a lack of any pending state court action between the parties, this Court has the authority to decide the declaratory judgment suit. *See id.* at 387-88. The Court thus must determine whether it should exercise its discretion to decide the declaratory action.

Federal courts have "substantial discretion in deciding whether to declare the rights of litigants." *Id.* at 389 (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Naturally, "a District Court cannot decline to entertain such an action as a matter of whim or personal disinclination." *Pub. Affairs*, 369 U.S. at 112. As with "other forms of equitable relief," courts should grant a declaratory judgment "only as a matter of judicial discretion, exercised in the public interest." *Id.* (citation and internal quotation marks omitted). "Especially where governmental action is involved, courts should not intervene unless the need for equitable relief is clear, not remote or speculative." *Soc'y of Separationists*, 959 F.2d at 1287 (quoting *Eccles v. Peoples Bank*, 333 U.S. 426, 43 (1948)). When deciding whether and how to exercise that discretion, courts should consider "practicality and wise judicial administration." *Wilton*, 515 U.S. at 288. And there is authority for finding it to be an abuse of discretion to grant declaratory relief when the issue presented is

11

based on a state law matter of first impression. *See, e.g., Westport Ins. Corp. v. Atchley, Russell, Waldrop & Hlavinka, L.L.P.*, 267 F. Supp. 2d 601, 634 (E.D. Tex. 2003) (citing *Omaha Prop. & Cas. Ins. Co. v. Johnson*, 923 F.2d 446 (6th Cir. 1991)).

Plaintiff premises the instant request for declaratory judgment on its interpretation of Tex. Loc. Gov't Code § 43.002(a)(2). The Court has uncovered one Texas case addressing this statute. *See City of Lufkin v. AKJ Props., Inc.*, No. 06-12-0005-CV, 2012 WL 2393087 (Tex. App. – Texarkana June 26, 2012, no pet.). But that case addresses the statute in the context of an affirmative defense to "a declaratory judgment lawsuit seeking to enjoin the [landowners] from operating their commercial business on the annexed property," which had been subsequently zoned "for agricultural use." *See id.* at *1, 7 (categorizing § 43.002(a)(1) and (2) as affirmative defenses that permit a property owner to continue a nonconforming use, notwithstanding a new contrary zoning ordinance adopted by a city).

Whether a plaintiff may use of § 43.002 as a sword rather than as an affirmatively defensive shield appears to be one of first impression that certainly cuts against the Court exercising its discretion to decide the request for declaratory judgment presented by the instant motion for summary judgment. Furthermore, although the instant motion squarely presents the § 43.002 issue, Plaintiff concedes that resolution of the issue will not resolve all claims in this case. Nor has Plaintiff explained how resolution under Texas law will inform a ruling on its federal claims. These matters of record likewise caution against the Court exercising its discretion to decide the declaratory judgment request.

But there are other considerations that favor the Court's exercise of its discretion to determine the declaratory judgment request. One, this case has been ongoing since 2018. Two, Plaintiff's planned subdivision development has been put on hold during this litigation. Three, Plaintiff

has expended substantial resources to procure the Property and prepare it for its planned development. Four, Plaintiff is incurring additional expenses while this litigation proceeds. In this case, the Court finds that practicalities and wise judicial administration, favor stepping out on the proverbial limb to address the state issue of first impression – interpreting § 43.002 in the context presented, not as an affirmative defense, but as an affirmative request for declaratory relief.

When federal courts "interpret a Texas statute," they "follow the same rules of construction that a Texas court would apply—and under Texas law the starting point of [the] analysis is the plain language of the statute." *Forte v. Wal-Mart Stores, Inc.*, 780 F.3d 272, 277 (5th Cir. 2015) (quoting *Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007)), *certified question accepted* (Mar. 6, 2015), *certified question answered*, 497 S.W.3d 460 (Tex. 2016). Further, courts do not interpret statutory provisions in isolation, they interpret statutes "as a whole" in an effort "to give effect to every part." *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 25 (Tex. 2003).

Here, § 43.002(a)(2) does not stand alone. Another relevant provision, § 43.002(b), states: "For purposes of this section, a completed application is filed if the application includes all documents and other information designated as required by the governmental entity in a written notice to the applicant." This provision is directly relevant to whether anyone filed a completed application for purposes of § 43.002(a)(2).

In pertinent part, the Application for Subdivision Plat Approval in this case specifically notifies the applicant in writing that

> [a] plat application will not be considered as filed pursuant to Section 212.009 of the Texas Local Government Code until all required documents and fees have been submitted and all of the terms and conditions of the Unified Development Code, including all necessary studies, plans and supporting information are accepted and approved, or the applicant has filed a waiver request for sections from which the plat deviates.

*See Ex. 3*. That Application also specifies in writing that "[a]n agent must furnish a signed 'Letter

of Authorization' from the owner, when submitting this application." *See id.* These written notices are consistent with Section 2.9.1(D) of Appendix A of the Code of Ordinances for the City, which provides: "Applications for a concept plan shall be made on forms provided by the City and must contain legal authorization by the property owner for the City to proceed with the request. Requirements for a complete application can be found in the technical manual and on the application." The technical manual states: "Any application submitted by someone other than the property owner requires a completed Letter of Authorization and/or a Legal Authorization by Property Owner." *See* Technical Manual, https://www.seguintexas.gov/departments/planning_codes/TechnicalManual.php. (last accessed Sept. 14, 2021).

The application in this case lists TRR as the "Record Owner of Property/Agent" and includes a Letter of Authorization, signed by McDonald for TRR and granting Vigil authority to act as agent for TRR. *See Ex. 3*. At the time of that submission in late August 2017, McCart was indisputably the owner of the Property – not TRR or McDonald. Plaintiff argues that "McDonald signed the authorization for the Application as President of TRR" and "[p]ursuant to the authority given him by the sales contract with McCart." *Mot.* at 6. Although Plaintiff argues that the contractual arrangement between McCart and TRR authorized TRR to act as agent for the owner, it directs the Court to no such contractual provision. It relies on § 8(a) of each contract but that section merely provides that TRR, as the purchaser, would be responsible for paying for any applications, legal representation, and other costs associated with the application or approval process. It does not create any agency relationship for purposes of signing on the owner's behalf. In fact, § 8(b) provides that the Seller agrees to sign the application if required by the City. And even if McCart expressly authorized TRR or McDonald to file the plat application, the Letter of Authorization lists the owner as McDonald for TRR and is signed by McDonald. It does not list McCart

as the owner.

Because the application lacks the required Letter of Authorization signed by the owner, it lacks matters required by the City in the written notice to the applicant. Accordingly, under § 43.002(b) no completed application was filed in August 2017. Further, when the City approved the submitted application in October 2017, it still lacked any authorization signed by the owner of the Property. And, at that time, the City erroneously believed McDonald or TRR was the owner. Ownership of the Property transferred in December 2017 after the City had commenced annexation proceedings in November 2017. And the latest the City "instituted" annexation proceedings within the meaning of § 43.002(a)(2) was when it passed the "annexation ordinance – either on first reading or otherwise." *See Jimenez v. City of Aransas Pass*, No. 13-17-00514-CV, 2018 WL 6565090, at *3 (Tex. App. – Corpus Christi-Edinburg, Dec. 13, 2018, no pet.) (footnote omitted) (interpreting "instituted" for purposes of Tex. Loc. Gov't Code § 43.064, which requires completion of annexation within ninety days after "the governing body institutes the annexation proceedings)).[4]

Therefore, in this case, the latest that the City instituted annexation proceedings within the meaning of § 43.002 was March 6, 2018. But Plaintiff presents no evidence of the filing of any application other than the one submitted in August 2017. It appears to rely solely on the August 2017 submitted application. And indeed, as set out in its amended complaint and the instant motion, its request for declaratory judgment relates only to August 30, 2017, when the preliminary plat application was filed or, no later than October 10, 2017, when the City approved such application.

---

[4] Plaintiff relies on this case. *See Mot*. at 15 n.66. Both § 45.064 and § 43.002 are within Chapter 43 of the Texas Local Government Code addressing municipal annexations and both sections use variations of the same word, "instituted." Further, there is a recognized "presumption that a given term is used to mean the same thing throughout a statute." *Mohamad v. Palestinian Auth*., 566 U.S. 449, 456 (2012) (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)). The City has presented nothing to overcome the presumption. Consequently, this Court finds the *Jimenez* case relevant to the interpretation of § 43.002.

Although Plaintiff presents a letter that indicates it submitted a final plat and construction plan application, the letter is vague as to the date of such filing. *See Letter from Howard to Quittner (Apr. 17, 2018)* (suggesting that the filing was on March 23, 2018, while leaving the possibility open that it was filed on an earlier date). The possibility of an earlier filing also appears contrary to other statements within Plaintiff's motion. *See Mot.* at 16 & n.67 (indicating that, had Plaintiff known of the signature issue with the August 2017 application sooner it would have filed an amended application prior to institution of annexation proceedings). At most, the prospect of a possible earlier filing creates a potential basis that Plaintiff filed a completed application prior to the date the City instituted annexation proceedings. But such prospect or possibility falls well short of showing that Plaintiff is entitled to the requested declaratory judgment as a matter of law. Furthermore, given the caution to courts regarding intervening when governmental action is involved, the Court does not find a clear need for equitable relief based on the information now before it.

There is no evidence that, for purposes of § 43.002, any completed application was filed before commencement of annexation proceedings. That the City approved the preliminary plat application does not change the fact that there was no completed application under § 43.002. Plaintiff presents no legitimate basis for construing that approval as any sort of compliance with the requirements of § 43.002.

For these reasons, Plaintiff has not carried its burden to show that it is entitled to a declaratory judgment that it has a protected legal right under Texas law to develop the Property as a manufactured home subdivision. Under the facts before the Court, Plaintiff did not take the necessary steps to invoke § 43.002. Plaintiff recognizes that for use to be protected under that statute, two things are required – one of which is the filing of a completed application before annexation are instituted. *See* Mot. at 14. Without such filing, it does not matter whether Plaintiff's intended

16

use was planned at least ninety days before the effective date of the annexation.

The Court recognizes that, "unless otherwise authorized by state law," the City did not possess the authority to regulate the use of the Property at the time of the application's submission because the Property was merely within the City's ETJ. *See* Tex. Loc. Gov't Code § 212.003(a)(1). No one suggests that state law otherwise authorized the City to regulate the use of the Property at that time. But the fact that the City was not authorized to regulate property within its ETJ does not eliminate the requirement for an application for subdivision plat approval. This requirement arises from Section 2.9.1(D) of Appendix A of the Code of Ordinances for the City. And, to utilize § 43.002(a)(2) requires the filing of a "completed application," which is further addressed under § 43.002(b).

In its reply, Plaintiff argues that the Court must determine whether as a matter of law, "a correctible error in the Seguin-approved preliminary plat application means that it was not completed." *Reply* at 2. The Court has determined that the signature required for the Letter of Authorization is more than a mere correctible error which does not affect the completeness of the submission. The signature of the owner is an express requirement for the required Letter of Authorization.

Had McCart signed a Letter of Authorization to authorize TRR/McDonald to act as his agent, then the completeness of the application may not be an issue. But those are not the facts before the Court. Here, McDonald signed a Letter of Authorization to authorize Vigil to act as agent for McDonald/TRR who is listed as the owner on that form. That form does not list McCart as the owner. It does not indicate that McDonald is signing the form on behalf of anyone other than TRR. Vigil then submitted the application while listing McDonald/TRR as owner/agent. This is simply insufficient to comply with the signature requirement. Although Plaintiff arguably could

correct signature issue prior to institution of annexation proceedings and thus still rely on § 43.002(a)(2), there is no evidence of any correction before the City instituted the annexation proceedings.

For all of these reasons, the Court denies the motion for summary judgment to the extent Plaintiff seeks a declaratory judgment.

## IV. FIFTH AMENDMENT

Plaintiff next argues that the Zoning Ordinance constitutes a regulatory taking that deprived it of the right to develop the property as a manufactured home subdivision. *Mot*. at 16. As discussed in the prior section, Plaintiff has not carried its burden to show that it is entitled to a declaration that it had a legal right to develop the Property in that manner. To the extent Plaintiff assumes that the Court agrees that it has such legal right, *see Reply* at 6, the Court finds the assumption erroneous and thus, does not support summary judgment on Plaintiff's taking claim.

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not 'be taken for public use, without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (citation omitted) (quoting Fifth Amendment). And it is an "oft-cited maxim that, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). The Supreme Court "often describe[s] use restrictions that go 'too far' as 'regulatory takings.'" *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021). The framework for such takings "now applies to use restrictions as varied as zoning ordinances." *See id*.

"Suffice it to say that government regulation-by definition-involves the adjustment of rights for the public good," which often "curtails some potential for the use or economic

18

exploitation of private property." *Andrus v. Allard*, 444 U.S. 51, 65 (1979). Thus, the Takings

Clause, "preserves governmental power to regulate, subject only to the dictates of justice and fair-

ness." *Id*. (citations and internal quotation marks omitted). To resolve each case, the courts must

both exercise their judgment as well as apply logic. *See id.* Even when a regulation imposes "a

significant restriction," such restriction is not dispositive. *See id*. at 65.

In general, whether a regulation constitutes an unconstitutional taking depends "upon the

particular circumstances [in that] case." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124

(1978) (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958)). But the

Supreme Court has "described at least two discrete categories of regulatory action as compensable

without case-specific inquiry into the public interest advanced in support of the restraint." *Lucas*,

505 U.S. at 1015. No case-specific inquiry is necessary when the challenged regulation "compel[s]

the property owner to suffer a physical 'invasion' of his property" or when it "denies all economi-

cally beneficial or productive use of land." *Id*.

Other than those two circumstances, the courts utilize three factors of "particular signifi-

cance" in determining whether a regulation (or ordinance) constitutes an unconstitutional taking:

(A) "the character of the governmental action," (B) "the economic impact of the regulation on the

claimant," and (C) "the extent to which the regulation has interfered with distinct investment-

backed expectations." *Penn Cent.*, 438 U.S. at 124. While these factors are significant, the courts

consider the totality of the circumstances in making their determination. *See id.* at 124-25. And the

Supreme Court has specifically held that, when determining "whether a use restriction effects a

taking, [it] has generally applied the flexible test developed in *Penn Central*, balancing factors

such as the economic impact of the regulation, its interference with reasonable investment-backed

expectations, and the character of the government action." *Cedar Point Nursery*, 141 S. Ct. at

2072.

The summary judgment evidence does not support finding the presence of either of the two discrete categories of regulatory action that would dispense with consideration of the *Penn Central* factors. This is not a case where the challenged ordinance compels or even involves any invasion of Plaintiff's property. Nor does the Zoning Ordinance deny Plaintiff all economically beneficial or productive use of his land. For purposes of this case, it is undeniable that the Zoning Ordinance merely prevents Plaintiff from developing its purchased property for manufactured housing. The ordinance does not preclude other residential housing that Plaintiff could develop on the Property. Resolution of the takings claim requires consideration of the totality of the circumstances with specific consideration given to the three particularly significant factors identified in *Penn Central*.

As part of the totality of circumstances considered, the Court recognizes that the contracts for the purchase of the Property were specifically contingent on being able to develop the Property for manufactured housing. But the contracts also contained a waiver of that contingency. Because McCart did not want any changed zoning while he owned the Property, the contracts further contained a clause specifically prohibiting any zoning change before closing. McDonald, through TRR and its agent Vigil, took steps to obtain approval of a preliminary plat application. However, the submitted application for plat approval lacked a Letter of Authorization that was signed by McCart, the owner of the Property. Vigil also stated in his accompanying letter that the proposed development was for "a single family residential subdivision" with 120 lots. And, prior to learning of the signature issue with the Letter of Authorization, the City approved such application with conditions and commenced the preliminary steps to annexing the Property.

The Court also recognizes the correspondence and communications that occurred between McDonald/TRR and representatives of the City between the approval of the preliminary plat

application and Plaintiff's purchase of the Property in December 2017, as well as relevant events and circumstances through the first quarter of 2018. Following the City's annexation that became effective on April 1, 2018, the City had a need to establish zoning designations for the annexed land. *See Ex. 9*. The City's Director of Planning & Codes, Pamela Centeno, requested zoning designations "for Area 1, which includes five properties that front" along a farm to market road. *See id*. She explained:

> This area is part of a growing residential area. There are two subdivisions proposed for development to the south and east of the newly annexed area. The timeline for development to the east is uncertain, but the development to the south is slated to begin construction this year. Also, an existing elementary school is immediately adjacent to the largest tract in this area. Considering the single family residential zoning to the east and south, the existing residential subdivision to the west in the un-zoned County jurisdiction, and the location of Vogel Elementary to the east, staff is recommending a zoning designation of Single Family Residential (R-1) for all five properties in Area 1.
>
> Three of the properties have existing residential dwellings. The two larger tracts are undeveloped. The current owner of the two larger tracts is not in favor of the zoning designation proposed by the City of Seguin as they have expressed an interest in developing a subdivision that allows manufactured housing, which is not allowed in the R-1 zoning. . . .

*Id*. This explanation is consistent with her deposition testimony. *See Centeno Dep.*at 150, 217-18.

Viewing the totality of the circumstances in the light most favorable to the City, the Court proceeds to the three particularly significant factors.

## A. Character of City's Actions

The Supreme Court has often "recognized that the nature of the [governmental] action is critical in takings analysis." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 489 (1987). Naturally, "the type of taking alleged is also an often critical factor." *Id*. at 489 n.18. Although the Supreme "Court has almost invariably found that the permanent physical occupation of property constitutes a taking, [it] has repeatedly upheld regulations that destroy or adversely affect real property interests." *Id*. (citations omitted).

21

With respect to the character of the City's actions, it is undisputed that the City zoned the Property at issue here as R-1 and such zoning was consistent with surrounding and existing site-built, single-family residential uses. Although Plaintiff views that reasoning as "dubious at best," *Reply* at 9, it points to no evidence that the zoning was not consistent with the surrounding and existing uses. Furthermore, viewing the evidence in the light most favorable to the City, the Court finds the character of the City's actions favor the City.

Plaintiff, nevertheless, contends that the City engaged in illegal "spot zoning" by deliberately zoning "the Property – and only Plaintiff's Property to prevent it from being developed as a manufactured home subdivision over McDonald's repeated written objections." *Reply* at 8. It argues that because the Zoning Ordinance only affects its property, "[t]he targeted, calculated character of Seguin's zoning ordinance marks it as a taking." *Id.* at 9. Again, viewing the evidence in the light most favorable to the City, the Court finds that the Zoning Ordinance concerns more than the Property owned by Plaintiff.

As the party moving for summary judgment, Plaintiff has the burden to show that it is entitled to judgment as a matter of law. This includes showing that there is no genuine dispute as to any material fact. At the very least, the City's stated reasoning for its zoning decision creates a genuine dispute of material fact concerning the character of the City's actions.

**B. Economic Impact**

Turning to the economic impact of the Zoning Ordinance, "the test for regulatory taking requires" the comparison of "the value that has been taken from the property with the value that remains in the property." *Keystone*, 480 U.S. at 497. Nevertheless, "the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the

aggregate must be viewed in its entirety." *Andrus v. Allard*, 444 U.S. 51, 65-66 (1979). Further-more, the takings clause does not guarantee a landowner the most profitable use of his property. *See id*. at 66. Nor does "a reduction in the value of property . . . necessarily equate[] with a taking." *Id*. Additionally, "the interest in anticipated gains has traditionally been viewed as less compelling than other property-related interests." *Id*. The Supreme Court has long held "mere diminution in the value of the property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. v. Const. Laborers Pension Tr.*, 508 U.S. 602, 645 (1993). "When analyzing the eco-nomic impact of a regulation, the loss of anticipated gains or potential future profits is typically not considered." *Hackbelt 27 Partners, L.P. v. City of Coppell*, 661 F. App'x 843, 850 (5th Cir. 2016) (per curiam) (citation and internal quotation marks omitted).

Plaintiff's expert proffered opinions as to the value of the property under three scenarios: *See Expert Report*. Under the first scenario, the expert opined that the Property was worth $1,780,000, as of March 30, 2018. *See id*. at 2. But this appraisal "is premised upon the extraordi-nary assumption that the subject had received a preliminary subdivision plat approval, and was entitled to final subdivision plat approval for development of a single-family residential subdivi-sion in the Seguin ETJ. *Id*. at 1 (bolding deleted). A second appraisal value ($1,380,000) is based upon the Property being subject to the R-1 zoning as of May 2, 2018. *See id*. at 1-2. The third appraisal ($2,030,000) is based upon the Property being developed with manufactured home use. *See id*. This latter appraisal "is predicated upon the hypothetical condition that the intended use as a future single-family residential subdivision, that did not exclude manufactured housing, is a grandfathered use and an entitlement to the land." *Id*. at 1 (bolding deleted). The expert concluded that the "Highest and Best Use" of the Property was as a "Future single-family residential subdi-vision." *Id*. at 4. Further, when Plaintiff, "as TRR's assign, closed on the Property" in December

2017, it invested $1,136,962. *Ex. 15* at 2.

The first and third appraisal scenarios represent Plaintiff's view that it can develop the Property with manufactured housing. For purposes here, the Court accepts those values. But even accepting a reduction in the appraised value of the Property, the Property is worth more than Plaintiff paid for it, even with the R-1 zoning. Given the cited caselaw, this factor appears to favor the City.

**C. Interference with Reasonable Investment-Backed Expectations**

"Not every investment-backed expectation can form the basis for a regulatory takings claim; instead, a claimant must establish interference with a reasonable investment-backed expectation." *Hackbelt 27 Partners, L.P. v. City of Coppell*, 661 F. App'x 843, 850 (5th Cir. 2016) (per curiam) (citation, emphasis, and internal quotation marks omitted). One factor that courts consider is whether the investor knows of the existing zoning. *See id*. Of course, a party's knowledge does not begin and end with the existing zoning when property is purchased. Courts must consider the entirety of a party's knowledge and expectations, including reasonable inferences from known facts. The Supreme Court, furthermore, has found it "quite simply untenable" that parties "could establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development." *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 130 (1978).

Here, Plaintiff maintains that its investment-backed expectation was to develop the acquired property as a manufactured home subdivision. While that expectation is clear from the purchase contracts for the Property, such expectation was not clearly expressed to the City initially. The initial correspondence with the City indicated that the proposed development would consist of "120 lots in a single family residential subdivision." The Zoning Ordinance does not appear

24

inconsistent with that stated expectation. In fact, when Plaintiff's expert conducted a Cash Flow and Profitability Analysis, it compared 120 lots with site built homes compared to 233 lots with manufactured homes. *See Ex. 18* at 1. Were the Court to only consider the first-stated planned development of Plaintiff, it could find no interference to that plan from the Zoning Ordinance.

But the facts show that Plaintiff planned to develop the Property as a manufactured home subdivision despite the ambiguous first statement of its planned development. And the facts show that City representatives knew of such plan before instituting annexation proceedings in March 2018. The Court thus examines more than the initial statement of Plaintiff's proposed plan.

Plaintiff undoubtedly invested substantial assets to develop the Property it acquired in December 2017. TRR undoubtedly made the purchase contracts contingent on obtaining approved zoning that permits development of a subdivision with manufactured housing. But the purchase contracts included three options should the Purchaser not obtain "a final, non-appealable approval." The purchase contracts could be terminated, an option not invoked. The time for closing could be extended, another option that was not invoked to extend past the December 2017 closing date, if at all. And thirdly, accepting "the Property with the current zoning and agree[ing to] waive th[e] contingency." Because there was no final, non-appealable approval as of the closing date in December 2017, it appears that the Purchaser took this third option. And Plaintiff provides no evidence otherwise.

Although the purchase contracts permitted a "final approval or a zoning change or plat filing" concurrent with closing, the parties to those contracts proceeded with the land purchase without any such approval. Plaintiff provides no evidence to the contrary. Thus, although the purchase contracts were initially contingent on obtaining approval of the re-zoning and platting of the Property to allow the Property to be developed and subdivided as a manufactured home

subdivision, that contingency went away with the December 2017 purchase of the Property.

At closing, Plaintiff not only knew that the Property was within the City's ETJ, but that the City had taken initial steps to annex land, including Plaintiff's property. Plaintiff knew of the October 2017 conditional approval of a preliminary plat application. As of October 31, 2017, McDonald assumed that the development rights and entitlements were grandfathered under State law and would not be subject to any changes but expressed concern that the City might take a different position. Although Centeno responded to McDonald's assumption and concern with a statement that "the development rights and entitlements that you are subject to under State law (Chapter 245) will be honored," later that day she inquired about the identity of the owner on the plat application after re-examining the application. The application itself informed TRR that the property's owner had to sign the Letter of Authorization. Before closing, R.W. McDonald had been informed that, if he had questions about vesting and how they would apply to the Rio Verde subdivision, the questions had to be in writing so that the City Attorney could be consulted. Further, Plaintiff would have known of the Mayor's request that the development not be for a manufactured home subdivision.

Viewing the facts in the light most favorable to the City, when Plaintiff/TRR completed the purchase of the Property it knew that Centeno had questioned who had ownership of the Property and it knew that the City was planning to annex land including the purchased property. Yet, although it was within the Purchaser's ability to stay closing pending greater certainty regarding the zoning, the purchase went through in December 2017 without anyone securing such certainty. Given these facts and others recited herein, the Court does not find that – as a matter of law – it was a reasonable investment-backed expectation that Plaintiff would be able to develop the land as a manufactured home subdivision.

This finding might change had Plaintiff had a reasonable expectation that Tex. Loc. Gov't Code § 43.002(a)(2) prohibited the changed zoning. But given the requirements of that statute as discussed at length previously, Plaintiff has not shown such a reasonable expectation. The Letter of Authorization lacks the required property owner's signature. It is not reasonable for Plaintiff to expect § 43.002(a)(2) to preclude the zoning change when the requirements of the statute were not satisfied. Further, Centeno's vague statement regarding Plaintiff's rights and entitlements neither changes the law's requirements nor provides a reasonable basis for Plaintiff to believe there was compliance with the statute.

Absent a reasonable expectation that Plaintiff would be able to proceed with its plan for a manufactured home subdivision, this factor favors the City regardless of whether the Zoning Ordinance interfered with such a plan. Furthermore, even if the Court were to find that Plaintiff's stated investment-backed expectation was reasonable, it would find the balance of the *Penn Central* factors still favor the City.

**D. Conclusion as to Takings Claim**

Viewing the facts in the light most favorable to the City, considering the totality of the circumstances with particular emphasis on the three *Penn Central* factors, and balancing those factors, the Court finds that Plaintiff has not carried its burden to show that it is entitled to judgment as a matter of law on its Fifth Amendment takings claim. Two of the particularly significant factors identified in *Penn Central* appear to support the City, while the third factor does not tilt the balance to Plaintiff's favor even if the Court were to find it supports Plaintiff. To obtain summary judgment on a Fifth Amendment takings claim requires more than Plaintiff has shown here.

**V. CONCLUSION**

For the foregoing reasons, the Court **DENIES** *Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's Regulatory Takings Claim and Request for Declaratory Judgment* (ECF

No. 68).

**IT IS SO ORDERED this 17th day of September 2021.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**